UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| LAURIE BAATZ<br>901 Alden Court<br>Medina, OH  44256<br><br>             Plaintiff,<br><br>   v.<br><br>MOHAWK INDUSTRIES, INC.<br>160 S. Industrial Boulevard<br>Calhoun, GA  30701<br><br>             *Please serve:*<br>             Valerie Barney, Esq.<br>             Deputy General Counsel,<br>             Litigation and Employment<br>             c/o Mohawk Industries, Inc.<br>             160 S. Industrial Blvd.<br>             Calhoun, GA  30701<br><br>   and<br><br>JEFFREY WEAVER<br>57 Thunder Ridge Drive<br>Acworth, GA  30101<br><br>             Defendants. | CASE NO.   4:20-cv-260-HLM-WEJ<br><br>JUDGE<br><br>**COMPLAINT**<br><br>(Jury Demand Endorsed) |

**COMPLAINT**

Plaintiff, Laurie Baatz, by and through counsel, for her claims against Defendants, Mohawk Industries, Inc. ("Mohawk") and Jeffrey Weaver, states as follows:

1

## NATURE OF ACTION

1. This action arises under Title VII of the Civil Rights Act of 1964 as amended ("Title VII") and 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act ("CRA") of 1991, and supplemental Georgia state claims.

## PARTIES

2. Plaintiff, Laurie Baatz, who is in a protected class under Title VII by virtue of her gender, was a Mohawk employee from December 4, 2017 through September 17, 2020, travelling extensively for her job with Mohawk, but working out of her home in Medina County, Ohio, when not travelling.

3. At all relevant times to this Complaint, Defendant Mohawk, a residential and commercial flooring manufacturer, was Plaintiff's employer as that term is defined in 42 U.S.C. § 2000e and Ga. Code Ann. § 34-5-2; was licensed to do business in the State of Georgia; regularly conducted business in the State of Georgia; and is jointly and severally liable for the acts of its managers and former Senior Vice President for its Healthcare and Senior Living division, Defendant Jeffrey Weaver.

4. At all times relevant hereto, Defendant Weaver (sometimes referred to herein as "Weaver"), Mohawk's former Senior Vice President of Healthcare and Senior Living, was Plaintiff's manager and an "employer" as that term is defined in 42 U.S.C. § 2000e and Ga. Code Ann. § 34-5-2.

## VENUE AND JURISDICTION

5. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 2000(e)-5(f), as Plaintiff's claims arise under the laws of the United States, 28 U.S.C. §§ 1331 and 1343, and diversity, under 28 U.S.C. §§ 2201 and 2202.

6. This Court has supplemental jurisdiction over Plaintiff's claims arising under Georgia law pursuant to 28 U.S.C. § 1367.

7. Jurisdiction over the federal discrimination claim is based on the fact that Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 20, 2020, and received her right to sue on or about August 23, 2020, dated August 20, 2020.

8. Plaintiff seeks compensatory damages pursuant to 42 U.S.C. § 2000e-5, as amended by the CRA of 1991, § 102 (b)(1), (2), and (3).

9. Plaintiff seeks costs and attorney fees pursuant to 42 U.S.C. § 2000e-5(k), as amended by the CRA of 1991, §§103, 107, and 113.

## VENUE

10. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391 because the events and conduct giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

11. In December 2017, Plaintiff, a 22-year veteran of the flooring industry, began her employment with Mohawk as Regional Vice President ("VP")

3

for Healthcare and Senior Living in Mohawk's Central region, and worked without incident until September 2018, when she began reporting to Defendant Weaver.

12.  Within approximately three (3) months of becoming Senior VP of Senior Living and Healthcare, Defendant Weaver terminated the employment of female employee L. Watnee, and replaced her with a man, J. Martere.

13.  Shortly after replacing Ms. Watnee with Mr. Martere, Defendant Weaver apparently found the territory too large for Mr. Martere and divided it in two, assigning part of it to Mr. Martere, and the other part to another employee.

14.  Defendant Weaver did not find the territory too large for Ms. Watnee when it was assigned to her.

15.  Shortly after Plaintiff began reporting to Weaver, Weaver began subjecting Plaintiff to gender discrimination by treating her significantly worse than her male counterpart, Mr. Martere, in the terms and conditions of employment.

16.  For example, in September 2019, Defendant Weaver required Plaintiff to hire an Account Executive for her Columbus/Cincinnati/Dayton market, but denied her the authority to hire N. Miller -- the female candidate of her choice, even though Mohawk's Corporate Recruiter, Caryl Henderson, had also recommended Ms. Miller for the position, but Weaver authorized Mr. Martere to hire the candidate of his choice -- a male, S. Lee, who, at that time, had been unemployed for approximately two (2) years.

17. Other examples of Defendant Weaver's gender-based discrimination toward Plaintiff include, but are not limited to: maligning, embarrassing, and insulting Plaintiff in the presence of H.R. employee Jaime Colon, which he did not do to Mr. Martere; refusing, in both Chicago and Indianapolis, to address Plaintiff's concern regarding the lack of alignment between the Healthcare/Senior Living and Education/Government and Workplace teams, the latter being assigned a larger trading area (i.e., a larger sales area within which to sell) than the trading area assigned to Plaintiff's Healthcare team; applauding Mr. Martere, in the June 2019 Regional Vice President's meeting at corporate headquarters, for "having come-to-Jesus meetings" with his team regarding territory alignment by telling his Account Executives to "stay in their lane", but telling Plaintiff, when she tried to discuss territory alignment, that she should not be "so emotional"; and handling whatever problems or issues Mr. Martere brought to his attention, but refusing to handle, or even participate in remedying, problems or issues Plaintiff brought to his attention, such as miscoding and territory alignment.

18. Moreover, on several occasions, Defendant Weaver falsely accused Plaintiff of "not liking" Strategic Account Manager ("SAM") Mark Chirello, despite Plaintiff repeatedly telling Weaver that her comments about Chirello had nothing to do with liking him, but rather, whether Chirello possessed the necessary skills to be the SAM.

19. To Plaintiff's knowledge, Defendant Weaver did not make false accusations about Mr. Martere.

20. Moreover, on September 27, 2019, Defendant Weaver placed Plaintiff on a Performance Improvement Plan for the pretextual reason that she failed to hire one or more team members and failed to meet her sales goals, but Weaver did not discipline Mr. Martere when he failed to meet his sales goals -- despite having a larger trading area *and* a lower sales requirement than Plaintiff.

21. It was malicious of Defendant Weaver to place Plaintiff on a PIP, even in part for not hiring one or more team members, when it was Weaver who refused to authorize Plaintiff's hiring of N. Miller, thereby thwarting Plaintiff's ability to comply with his hiring directive in a timely manner.

22. Also, Defendants set Mr. Martere's sales requirement at slightly above $6M, but set Plaintiff's sales requirement at $10.3M, and assigned a sales region to Mr. Martere that encompassed the heavily populated cities of New York, Boston, Philadelphia, Washington D.C., Charlotte, and Nashville, while assigning a sales region to Plaintiff that encompassed the less populated areas of Pittsburgh, Detroit, Cleveland, Columbus, Cincinnati, Dayton, Indianapolis, Chicago, St. Louis, and Minneapolis.

23. Thus, Mr. Martere's sales budget/requirement was more favorable to him than Plaintiff's budget/requirement was to her, as there were fewer sales opportunities in the metropolitan areas Plaintiff represented than in those Mr.

Martere represented.

24. In 2019, Defendant Weaver used his authority as a Senior VP to reduce Mr. Martere's sales goals from $6.1M to $5.75, but failed to reduce Plaintiff's sales goals, or even discuss the matter with her, despite Plaintiff's requests to discuss the inequitable assignment of territories and sales goals with him.

25. Thus, Defendant Weaver's decision to place Plaintiff on the September 27, 2019 PIP was based, at least in part, on his gender-based discriminatory actions toward Plaintiff in terms of budgets and territories.

26. Defendant Weaver stated on Plaintiff's PIP that she was year-over-year -26% under goal.

27. However, if Plaintiff's team members (Account Executives) closed any sales within the first six (6) months of 2018, they were permitted to retain their commission and volume (i.e., they were given credit toward their sales goal), but as of July 1, 2018, a new "segmentation" plan was implemented, requiring Account Executives to select one segment and work/sell only within that segment, as a consequence of which, Plaintiff's team lost many accounts and relationships they had built, which adversely affected their sales in 2019.

28. In May of 2019, female Senior Living Regional Vice President L. Edwards resigned due, at least in part, to the disrespectful way Defendant Weaver treated her.

29. Weaver replaced Ms. Edwards with a 28-year old male, A. Wilm, who had had no previous management experience.

30. Almost from the moment he became Plaintiff's manager, Defendant Weaver seemed to be intent on terminating Plaintiff and replacing her with another man by, *inter alia*, inaccurately calculating her team's sales and refusing to correct his errors; assigning her a smaller territory and higher sales goal than Mr. Martere; wrongfully placing her on a PIP with unachievable goals; and impeding her ability to hire quality Account Representatives.

31. Defendant Weaver also spread false and defamatory rumors and private information about Plaintiff, including telling people who have no need to know -- both inside and outside Mohawk -- that he had placed her on a 30-day PIP; that she was not a good performer; that she was not a good leader; that she would "soon be out the door"; that it did not matter if she attended meetings because he did not want to see or deal with her; and that he wanted to "get rid of her" because she is a woman.

32. In October 2019, Plaintiff retained legal counsel for advice and representation in connection with her gender-based discrimination issues at Mohawk.

33. On October 22, 2019, Plaintiff's counsel sent a letter of representation to Mohawk outlining Plaintiff's legal claims, and the events underlying each of those claims.

34. After, and at least in part as a result of, Plaintiff having retained counsel, and her counsel's transmission of a letter of representation to Mohawk, Defendant Weaver retaliated against Plaintiff by, *inter alia*, distancing himself from her; not communicating with her, except for group communications and creating the 2020 budget with her; maligning her to her peers; and publishing private facts about her in the open market and to people who had no reason or need to know.

## **COUNT ONE**
**(Gender Discrimination - Title VII)**

35. Plaintiff reavers and realleges each paragraph above as if fully set forth herein.

36. Pursuant to Title VII, Plaintiff is in a protected class by virtue of her gender (female).

37. Plaintiff was equally or more qualified for her position at Mohawk than her similarly situated male counterpart, Joe Martere, yet Defendants treated Plaintiff worse than Martere in the terms and conditions of employment, including but not limited to disciplinary matters, promotional opportunities, territory and budget requirements, and salary.

38. Defendants engaged in a pattern and practice of discriminatory treatment toward Plaintiff and other female employees by treating them significantly worse than their similarly situated male counterparts in the terms and conditions of

employment, based, at least in part, on their gender.

39. Defendants' actions violated Plaintiff's rights under Title VII.

40. Defendants engaged in this discriminatory conduct recklessly, maliciously, and intentionally.

41. Defendants' conduct reflects an outrageous and conscious disregard for Plaintiff's rights, which had a great probability of causing, and did cause, Plaintiff to suffer substantial damages, rendering Defendants jointly and severally liable for punitive damages.

42. As a result of Defendants' actions, Plaintiff has suffered damages, including but not limited to lost wages and mental anguish, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

## COUNT TWO
### (Libel - O.C.G.A. § 51-5-1)

43. Plaintiff realleges each paragraph above as if fully set forth herein.

44. Defendant Weaver made numerous false and defamatory statements about Plaintiff, which he published to third parties without privilege, due to his malicious attitude and behavior toward Plaintiff, which statements were either defamatory *per se*, or caused special harm to Plaintiff via damage to her reputation.

45. Defendant Weaver's defamation of Plaintiff violated O.C.G.A. § 51-5-1.

46. Defendant Weaver engaged in this conduct recklessly, maliciously,

and intentionally.

47. Because he was in an upper management position with Mohawk at the time he engaged in these acts, and because he engaged in these acts in furtherance of, and as part of, his job duties for Mohawk, Defendant Weaver's actions are imputed to Mohawk, and Mohawk is jointly and severally liable to Plaintiff for Weaver's defamation of her.

48. Mohawk was put on notice of Plaintiff's claims, including that Defendant Weaver had defamed her and published private facts about her to individuals who had no need to know, but failed to discipline Weaver, or otherwise put an end thereto, and as such, Mohawk aided and abetted Defendant Weaver's unlawful defamation of Plaintiff.

49. Defendants' conduct reflects an outrageous and conscious disregard for Plaintiff's rights, which had a great probability of causing, and did cause, Plaintiff to suffer substantial damages, thereby rendering Defendants liable for punitive damages.

50. As a result of Defendants' actions, Plaintiff has suffered damages, including but not limited to lost wages, mental anguish, and loss of reputation, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

## COUNT THREE
**(Public disclosure of private facts)**

51. Plaintiff realleges each paragraph above as if fully set forth herein.

52. Defendant Weaver disclosed private facts about Plaintiff to the public.

53. Defendant Weaver disclosed employment-related private facts about Plaintiff that were not only embarrassing and offensive to Plaintiff, but also to reasonable persons of ordinary sensibilities.

54. Defendant Weaver engaged in this conduct recklessly, maliciously, and intentionally.

52. Because he was in an upper management position with Mohawk at the time of these acts, and because he engaged in these acts in furtherance of, and as part of, his job duties for Mohawk, Defendant Weaver's actions are imputed to Mohawk, and Mohawk is jointly and severally liable to Plaintiff for Weaver's public disclosure of private facts about Plaintiff.

55. Mohawk was put on notice of Plaintiff's claims, including that Defendant Weaver had published private facts about her that were not only embarrassing and offensive to Plaintiff and other reasonable persons of ordinary sensibilities, but failed to discipline Weaver, or otherwise put an end thereto, and as such, Mohawk aided and abetted Defendant Weaver's unlawful conduct.

56. Defendants' conduct reflects an outrageous and conscious disregard for Plaintiff's rights, which had a great probability of causing, and did cause, Plaintiff to suffer substantial damages, thereby rendering Defendants liable for punitive damages.

55. As a result of Defendants' actions, Plaintiff suffered damages,

including but not limited to lost wages, mental anguish, and loss of reputation, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

WHEREFORE, Plaintiff respectfully prays that this Honorable Court:

A.  Order Defendants to make Plaintiff whole by providing compensation for violation of her civil rights, emotional distress, reputational damage, and punitive damages, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00);

B.  Award Plaintiff appropriate back pay, front pay, and reimbursement for lost wages and in an amount to be proven at trial;

C.  Grant Plaintiff her attorney's fees, costs, and disbursements;

D.  Award Plaintiff pre- and post-judgment interest at the statutory rate; and

E.  Grant such further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

*/s/ John Batson*
John Batson

Respectfully submitted,

/s/ John P. Batson
John P. Batson
Ga. Bar No. 042150
Attorney for Plaintiff
P. O. Box 3248

>Augusta, Georgia 30914-3248
>(706) 737-4040 (telephone)
>(706) 736-3391 (facsimile)
>jpbatson@aol.com

## CERTIFICATE OF FONT COMPLIANCE

This is to certify that the Font is 14 point Times New Roman in Word.

Respectfully submitted this 12th day of November, 2020.

>/s/ John P. Batson
>John P. Batson
>Ga. Bar No. 042150
>Attorney for Plaintiff
>P. O. Box 3248
>Augusta, Georgia 30914-3248
>(706) 737-4040 (telephone)
>(706) 736-3391 (facsimile)
>jpbatson@aol.com